**Angela SAVAGE, Plaintiff,**

v.

**Lawrence C. SAVAGE, Defendant.**

**C.A. No. 1613–S.**

Court of Chancery of Delaware, Sussex County.

Submitted: July 28, 2006.

Decided: Sept. 7, 2006.

---

4. *Windsor v. State*, 676 A.2d 909 (Table), 1996 WL 145800 (Del.Supr.).

Kashif I. Chowdhry, Moore & Rutt, P.A., Georgetown, DE, for Plaintiff.

Dean A. Campbell, Law Office of Dean A. Campbell, LLC, Georgetown, DE, for Defendant.

## OPINION

STRINE, Vice Chancellor.

This case involves a property dispute between divorced spouses over the ownership of the home they lived in while they were married. That home, located at 34013 Woodland Circle, Lewes, Delaware 19958 (the "Home"), is titled solely in the name of defendant, Lawrence "Larry" Savage. By this action, plaintiff Angela Savage seeks to add her name to the deed to the Home as a tenant in common or a joint tenant with her former husband. In the alternative, Angela seeks the imposition of a remedial trust to both give legal effect to a claimed understanding between the parties that the Home would be jointly owned in equal one-half interests and to prevent Larry from evicting her, selling the Home, and enriching himself unjustly at her expense.

During their divorce proceedings, Larry and Angela deferred addressing the division of their marital property, hoping to reach an amicable settlement at a later time. Therefore, the Family Court closed their divorce case without addressing what rights, if any, Angela had to the Home, or more generally, how Angela's and Larry's property should be divided.

Since they separated, Angela and Larry have attempted to negotiate a settlement on many occasions. During this process, Larry has allowed Angela to live in the Home with the children from her marriage with Larry as well as with her new romantic partner and a child Angela has had with that new partner. This case arose when Larry indicated his intention to sell the Home, an intention that he expressed after prior discussions with Angela about different arrangements had broken down.

Allegedly fearing eviction, Angela filed this action, and an action to reopen her divorce proceeding in the Family Court, both seeking to obtain a judicial order requiring, in substance, that she be treated as an equal owner of the Home with Larry, and giving her credit for improvements she has made to the Home since she separated from Larry. At the same time, Angela also filed an action to collect allegedly past-due child support in the Family Court. The Family Court refused to reopen the divorce, finding that Angela had not proven a basis for reopening under

Family Court Rule 60(b), and has yet to rule on the child support action.

Asserting that the Family Court, not this court, is the proper tribunal to resolve this matter, Larry has moved to dismiss this case for lack of subject matter jurisdiction. In this opinion, I grant his motion. The clear terms of the Delaware Code give the Family Court subject matter jurisdiction over cases like these, to the exclusion of this court, and provide Angela with an adequate remedy at law. Angela had the right to seek precisely the relief she now seeks against Larry in her divorce proceeding in the Family Court. In the divorce action, the Family Court was entitled to exercise all the remedial authority of a court of equity in determining what interest Angela had in the Home.

The fact that Angela chose not to pursue such relief in a timely manner and that the Family Court denied her motion to reopen does not confer upon this court the subject matter jurisdiction that the General Assembly decided to entrust to the Family Court. Whatever relief Angela is entitled to at this stage must be granted by the Family Court. If the Family Court concludes that Angela's time to claim ownership in the Home has come and gone, Angela must challenge that decision in the Supreme Court or move on.

To permit her now to present her claims to this court would disrespect clear statutes of this State empowering the Family Court and would undermine the General Assembly's desire to create a single court with comprehensive authority to address marital relations. To that point, to hear Angela's case and make an equitable ruling would likely require this court to consider not only ownership of the Home, but the full range of property acquired by the parties during their marriage, and the child support Larry has or has not provided to Angela since. That is, it would involve this court shaping the economic basis on which the former parties to a marriage should move forward—a fundamental function of the Family Court.

## I. *Factual Background*

Angela and Larry Savage were married in 1993 and purchased the Home soon thereafter. The terms of the purchase were outlined in a Purchase and Sale Agreement that both Angela and Larry signed on November 26, 1995. Two months later, at Angela and Larry's direction, the Home was conveyed by deed to Larry individually. On that same day, Larry alone executed a $95,000.00 mortgage on the property. Larry's parents provided funds to help with the cash down payment.

Angela now argues that although Larry solely held the title and the mortgage to the Home in his name, it was never the parties' intent that the Home would belong to Larry alone. Rather, Angela claims the purchase was a joint undertaking structured to secure a low-interest loan that the couple qualified for because Angela was on unpaid maternity leave at the time. Angela fails to explain why titling the Home solely in Larry's name would have this effect, unless the parties simply sought to elide from their loan application the reality that Angela had a good job to return to after her pregnancy leave because the inclusion of her income would have resulted in their lack of entitlement under the low-income loan program from which the loan was sought. But that is for another day. For now, what matters is that Angela claims that she and Larry bought the Home as spouses for their joint interest, regardless of the title. In support of that claim, Angela has proffered a copy of a second mortgage on the Home that was entered into by Larry and her, which she has made payments on after Larry moved

out, and a third mortgage, also jointly executed, securing a line of credit.

Angela and Larry lived together in the Home until August 2003. During that month, Larry moved out, while Angela continued to live in the Home with her children from her marriage with Larry. At some point thereafter, Angela's new lover moved in and she has allegedly now had a child from this relationship.

Since Larry moved out, Angela has paid the mortgages, costs, taxes, utilities and expenses related to the Home. She also claims to have improved the Home by replacing windows, paving the driveway and altering the landscaping. In total, Angela claims to have expended $34,000.00 on these household bills as of June 13, 2005. By contrast, Larry has admittedly made no contribution to the maintenance or improvement of the Home since the separation.

These living arrangements and the state of the Home's title were known to both parties during the pendency of their divorce case. Instead of hammering out a division of marital property in the Family Court, Angela and Larry opted to let their divorce case close without asking the Family Court to involve itself in the question of what property each would take from the marriage. Therefore, on June 9, 2004, the Family Court closed the Savages' divorce case.

Apparently, Angela and Larry had achieved a level of amity that gave them hope that they could divide their property interests without court involvement. In support of their contentions on this motion, each of them has submitted evidence of various attempts to broker an amicable division of their property. Angela contends that e-mails from Larry reflect an acknowledgement on his part to share half of the proceeds of any sale of the Home with Angela, once certain expenses were paid (including a repayment of the down payment costs fronted by Larry's parents). Other aspects of the negotiations indicate a willingness on Larry's part to allow Angela to remain in the Home for a period of time sufficient for her to obtain the wherewithal to purchase the Home from Larry at a fair market value determined by an appraisal. Agreement ultimately proved impossible as the discussions ranged beyond the Home itself to include Angela's allegations that Larry owed her thousands of dollars in unpaid child support and disputes over the relative economic contributions each had made during their marriage permeating the negotiations.

In the late spring 2005, Angela retained counsel. Her counsel made a proposal offering to purchase Larry's interest in the Home for $145,000.00 to resolve their disagreement. That proposal, though, was predicated on an assertion that Larry was not honoring his child support obligations and came at a price Larry considered too low. Though negotiations continued, the involvement of counsel did not lead to an agreement. Instead, Larry, through his counsel, eventually demanded that Angela vacate the residence after a 60–day notice period ending on Halloween 2005. During the notice period, Larry's counsel indicated that Angela would be expected to continue to pay "rent" (i.e., the mortgages and costs of the Home) and that Larry would begin marketing the Home for sale.

After receiving this demand Angela returned to court. In the Family Court, Angela filed a motion to reopen her divorce on August 19, 2005, and a separate claim for child support. Also, on September 8, 2005, Angela filed this suit in this court.

Her petition in the Family Court asserted excusable neglect in failing to ask that

court to retain jurisdiction over the property distribution during the original divorce case and requested an equitable division of the marital property. Likewise, Angela's amended complaint in this court alleged that she was always supposed to own half of the Home and that she had been deprived of that interest by Larry's representations of joint ownership and promises to reach an amicable division of their estate.

Larry answered the complaint and filed counterclaims of his own. For his part, Larry denied that there had ever been an agreement to give Angela an equitable interest in the Home and claimed that the deed reflected their original intent. Nonetheless, Larry also claimed that Angela and he had reached an understanding in September 2003 that Angela would keep the marital personal property and that Larry would have the right to sell the Home, pay back his parents and cover any selling expenses, and keep half of the sale proceeds, with the remainder going to Angela. Larry further alleges that as part of the September 2003 agreement, he allowed Angela to rent the home at a price equal to the costs of the mortgage and overall carry until Angela could obtain the wallet to buy the Home at a fair market value in a sale which never materialized. In October 2004, Larry claims that Angela sought to extend the rental period to permit her to secure a loan to purchase the Home. By August 2005, Larry claims Angela had breached their agreement by refusing to purchase the Home, by failing to allow Larry's realtor to show the Home to other potential buyers, and by refusing to vacate the Home to allow it to be sold. As a result, Larry counterclaims for specific performance of the sale agreement and for damages for breach of contract.

On March 14, 2006, the Family Court issued an order denying Angela's petition to reopen the divorce case to divide the marital property including the Home. In that decision, the Family Court found:

> Wife's name is on neither the title to the former marital home, nor the mortgage. As Wife has failed to pay the mortgage on the home and failed to ask the Court to retain ancillary jurisdiction over the matter of property division, Wife has no legal right to remain in the home.[1]

Hoping for a better result, Angela entreats this court to do what the Family Court would not—that is, award her a share of the Home.

By motion dated June 22, 2006, Larry argues that this Court lacks subject matter jurisdiction to decide this question because Angela was afforded an adequate remedy at law through the proceedings in the Family Court and because, by statute, Angela is simply in the wrong court. Angela replies that the issues in her amended complaint before this court are distinct from those before the Family Court, and that due to Larry's "unconscionable conduct and misrepresentations" she has been "deprived of her opportunity to proceed with an action for marital division before the Family Court and is without any legal remedy."[2]

## II. *Legal Analysis*

■ In addressing Larry's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is useful to begin by setting forth this court's core statutory jurisdiction, which is codified at Sections 341 and 342 of the Title 10 of the Delaware Code. Section 341 empowers the Court of Chancery to "hear and determine

---

1. *Savage v. Savage*, File No. CS04–01180, slip op. at 6 (Del.Fam.Ct. Mar. 14, 2006).

2. Pl. Br. 8.

all matters and causes in equity." [3] Meanwhile, § 342 limits that broad grant of power, stating: "The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." [4]

Because this court has a limited and focused jurisdictional mandate, the plaintiff bears the burden of demonstrating that equitable subject matter jurisdiction exists.[5] This jurisdictional inquiry is a serious one involving a close examination of the plaintiff's claims and desired relief, not a perfunctory verification of the plaintiff's "incantation of magic words" sounding in equity.[6] It has long been recognized that:

> Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will excuse the court … from a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate. If a realistic evaluation leads to the conclusion that an adequate remedy is available, this court, in conformity with the command of Section 342 of Title 10 of the Delaware Code, will not accept jurisdiction over the matter.[7]

Thus, to determine whether Angela has met the jurisdictional threshold, I "must review the allegations of the complaint as a whole to determine the true nature of the claim." [8]

In this case, it is obvious that Angela's interest in the Home arises by virtue of an agreement that she reached with Larry either during or after—but certainly, incident to—their marriage. Despite feeble efforts to argue to the contrary, Angela's central argument remains that the Home was purchased and maintained as jointly-owned marital property and as a result she is entitled to her share. Angela claims that because both spouses acted together to purchase the Home during their marriage, because both used it as their marital residence, and because both supported its upkeep, both spouses should be entitled to equal interests in the Home. Alternatively, Angela argues that she and Larry later reached an agreement to that effect. Either agreement—whether made during the marriage or after its end—falls within the capacious contours of § 507 of Title 13. Indeed, in her Family Court action, Angela herself described the Home as the "Marital Residence" and pled facts to establish its nature as marital property within the statutory definition in order to request her equitable share of it.[9]

Angela's negotiations with Larry further illustrate that this matter goes beyond a mere property ownership dispute. Angela has plainly bound up her argument regarding the Home with other issues related to her marriage to and divorce from Larry. For example, she has demanded that the proceeds Larry receives from any disposition of the Home be offset by arrearages in child support and by credits to

---

3. 10 *Del. C.* § 341.

4. 10 *Del. C.* § 342.

5. *Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., II,* 2005 WL 1364616, at *3 (Del.Ch. May 27, 2005).

6. *McMahon v. New Castle Assocs.,* 532 A.2d 601, 603 (Del.Ch.1987).

7. *Id.*

8. *Christiana Town Center, LLC v. New Castle County,* 2003 WL 21314499, at *3 (Del.Ch. June 6, 2003).

9. *See* 13 *Del. C.* § 1513 (defining marital property as "all property acquired by either party subsequent to the marriage" with limited exceptions).

her for maintenance of the Home. Both of these adjustments clearly arise from the parties' divorce and the living arrangements they established for themselves and their children in the wake of their failed marriage. Those family relations are the core of this controversy.

As a result, this case is in the wrong court. A realistic evaluation of the true nature of Angela's claims reveals that she cannot proceed in this court because the General Assembly has entrusted another court with jurisdiction over cases like this. That court is the Family Court.[10]

The Family Court has assumed many of the duties that both this court and the Superior Court used to perform involving families.[11] Although there were some growing pains when the Family Court's assumption of the former duties of this court caused confusion, the General Assembly has made the Family Court's authority clearer over time. As the Family Court's jurisdiction in family matters has expanded, this court's jurisdiction in those areas has shrunk.[12]

The statutes make clear that Angela's claims belong in the Family Court. With regard to marriages, § 921 of Title 10 vests the Family Court with "exclusive original civil jurisdiction in ... all proceedings relative to divorce and annulment under Chapter 15 of Title 13,"[13] and § 1513 of Title 13 empowers the Family Court to "equitably divide, distribute and assign the marital property between the parties...."[14] More important for this case, § 507 of Title 13 grants broad jurisdiction over agreements between spouses or former spouses:

> The Family Court of the State shall have exclusive original jurisdiction over all actions arising under this chapter. The Court shall have exclusive jurisdiction over the construction, reformation, enforcement and rescission of agreements made between future spouses, spouses and former spouses concerning the payment of support or alimony, the payment of child support or medical support, the division and distribution of marital property and marital debts and any other matters incident to a marriage, separation or divorce.[15]

---

**10.** In a recent decision, this court held that an ex-husband's claim that his wife was breaching an agreement about property reached by them that was not the subject of a Family Court order was not within this court's subject matter jurisdiction. Rather, the ex-husband's claim had to be presented to the Family Court. In so ruling, this court stated: "If an agreement between Benge and his ex-wife does exist, § 507(a) gives the Family Court jurisdiction over that agreement, including the right to interpret, enforce, and rescind that agreement." *Benge v. Oak Grove Motor Court, Inc.,* 2006 WL 345006, at *2 (Del.Ch. Feb. 7, 2006). That ruling was affirmed on appeal. *Benge v. Oak Grove Motor Court, Inc.,* 2006 WL 1725615, at *1 (Del. June 21, 2006).

**11.** *See, e.g.,* 13 *Del. C.* § 507(b) (terminating jurisdiction of the Court of Chancery in civil actions for separate maintenance in favor of the Family Court); Del. S.B. 475, 128th Leg., 1st Sess., 60 Del. Laws, ch. 297, §§ 1–11

(1975) (substituting Family Court for Superior Court in Chapter 15, Title 13 to vest the Family Court with sole jurisdiction over divorce and annulment proceedings).

**12.** *See Benge,* 2006 WL 345006, at *1–2.

**13.** 10 *Del. C.* § 921(11).

**14.** 13 *Del. C.* § 1513(a).

**15.** 13 *Del. C.* § 507(a). The Family Court is also imbued with broad powers to act within its subject matter jurisdiction. *See, e.g.,* 10 *Del. C.* §§ 925(9), 925(15) (authorizing the Family Court to "hear, determine, render, and enforce judgment in any proceeding before the Court;" and "[i]n any civil action where jurisdiction is otherwise conferred ... [to] enter such orders against any party to the action as the principles of equity so require.").

Section 507 is of particular significance because it was at the center of the debate over the extent of the Family Court's jurisdiction. In response to a Supreme Court decision suggesting that this court retained certain powers in construing agreements between former spouses not incorporated in a divorce or annulment proceeding,[16] the General Assembly explicitly amended § 507 to entrust the Family Court with jurisdiction over these agreements and to end this court's involvement in such matters.[17] That intention has been recognized by both this court and the Family Court.[18]

The notion of expansive Family Court jurisdiction is not a new one. When the unified Family Court was first established in Delaware in 1971, the General Assembly stated its purpose in the statutory text:

(a) In the firm belief that compliance with the law by the individual and preservation of the family as a unit are fundamental to the maintenance of a stable, democratic society, the General Assembly intends by enactment of this chapter that one court shall have original statewide civil and criminal jurisdiction over family and child matters....

(b) This chapter shall be liberally construed that these purposes may be realized.[19]

That language has remained unchanged to this date.[20] Likewise, when amending § 921 in 1989 to endow the Family Court with exclusive civil jurisdiction over petitions by former spouses seeking an interest in or disposition of jointly titled real property acquired during marriage, the General Assembly explicitly addressed the scope of the Family Court's powers in the Act's preamble:

WHEREAS, by virtue of 13 Delaware Code, Chapter 15, the Family Court retains jurisdiction to equitably divide marital property following a divorce proceeding; and

WHEREAS, on occasion parties fail to request the Court's retention of jurisdiction for such purposes; and

WHEREAS, it is then necessary for the parties to seek relief through the Court of Chancery; and

WHEREAS, it appears that such jurisdiction should vest with the Family Court.[21]

---

**16.** *Sanders v. Sanders*, 570 A.2d 1189, 1189–90 (Del.1990) (agreeing with appellant's claim that "the Court of Chancery had exclusive original jurisdiction over equitable actions to rescind a contract, and that the power of the Family Court to divide marital property was statutorily limited under 13 *Del. C.* § 1513 (1981) to 'a proceeding for divorce or annulment.' ").

**17.** Del. H.B. 744, 135th Leg., 1st Spec. Sess., 67 Del. Laws, ch. 446, § 1 (1990). In its legislative synopsis, the General Assembly stated that § 507 was amended to "clarif[y] the kinds of agreements within the Family Court's jurisdiction." *Id.*

**18.** *See, e.g., Fagan v. Fagan*, 1995 WL 523588, at *2 (Del.Ch. Aug. 31, 1995) ("The purpose of the statute quoted above [§ 507] is to transfer actions for specific performance of a contract

concerning division of marital property from the Court of Chancery to Family Court."); *T.M.K. v. K.A.K.*, 2002 WL 32121314, at *1 (Del.Fam.Ct. Oct. 23, 2002) ("Although prior case law made the distinction between incorporated and unincorporated agreements in order to determine jurisdiction, the current language of the code has been interpreted by this Court to grant authority to consider separation agreements regardless of whether such agreements are incorporated into an Order of the [Family] Court.").

**19.** 10 *Del. C.* § 902 (1971); Del. S.B. 100, 126th Leg., 1st Sess., 58 Del. Laws, ch. 114 (1971) (establishing the Family Court).

**20.** 10 *Del. C.* § 902 (2006).

**21.** Del. S.B. 106, 135th Leg., 1st Sess., 67 Del. Laws, ch. 89 (1989).

This language speaks directly to this case because it recognizes that, like the Savages, couples getting divorced often failed to wrap up all marital matters before the divorce decree. Thus, the General Assembly made plain that the Family Court was the court to decide such disputes even after the divorce. It is true that the Supreme Court initially viewed the 1989 Act as a "careful" extension of jurisdiction.[22] But, the General Assembly's subsequent amendment of § 507 in 1990 that placed additional matters within the Family Court's jurisdiction clearly reflected a desire to clarify that the Family Court's authority over property disputes between former spouses was broad and exclusive.[23] In other words, the General Assembly made plain that it had taken a more aggressive pace in bringing about the intent expressed in 1971 than the Supreme Court believed. Now, in light of the totality of the development of the Family Court's jurisdiction, the present state of the relationship between the Court of Chancery and the Family Court regarding agreements between former spouses over property divisions is nicely encapsulated in the title of § 507: "Jurisdiction in Family Court; termination of chancery jurisdiction."[24]

■■■ The fact that the Family Court rejected Angela's motion to reopen her divorce under Rule 60(b) does not change the jurisdictional landscape. Angela clearly had an adequate legal remedy in the Family Court and the General Assembly has clearly divested this court of jurisdiction over cases of this kind. The mere fact that a party fails to avail itself of an adequate legal remedy in a timely manner does not entitle that party to proceed in this court rather than the court chosen by the General Assembly to handle the type of claim the party is advancing. As this court explained in *In the Matter of the Real Property of Former Wife, K. and Former Husband, K.* ("*Wife K*"):

> "[I]f a litigant fails to avail himself of a remedy provided by law and is subsequently barred from pursuing that remedy because of his own lack of diligence, he cannot then rely on the absence of a remedy at law as a basis of equitable jurisdiction."[25]

22. *Sanders*, 570 A.2d at 1192 ("[T]he General Assembly has been careful to limit the jurisdiction of the Family Court over petitions between former spouses regarding disposition of marital property.").

23. In 1989, the Supreme Court held that a condition precedent to the Family Court's jurisdiction to equitably divide marital property was the existence of a divorce proceeding in Delaware. *Villarroel v. Villarroel*, 562 A.2d 1180, 1183 (Del.1989). Then, building on that decision, the Supreme Court determined that absent an proceeding for divorce or annulment, the Family Court lacked jurisdiction over actions for contractual rescission and ancillary relief under 13 *Del. C.* Ch. 15. *Sanders*, 570 A.2d at 1190. By amending 13 *Del. C.* § 507 in 1990, the General Assembly clarified that the Family Court has exclusive and broad authority over contractual and property division disputes between current and former spouses. This clarification was recently recognized by the Family Court. *E.F.L. v. J.M.D.*, 2002 WL 1929538, at *3 (Del.Fam.Ct. Jan. 8, 2002) ("This Court finds that it has the authority to consider agreements [relating to marital property] regardless of whether such agreements were merged into or otherwise incorporated as an Order of the Court.").

24. The Superior Court has also recognized its diminished jurisdiction in family law matters. *See Matthaeus v. Matthaeus*, 2003 WL 1826285, at *5 (Del.Super. Apr. 7, 2003) (refusing to "undermine the legislative intent of creating a special court uniquely trained in the handling of family matters and the resolution of such disputes" and therefore declining jurisdiction over tort claims "intrinsically related and intertwined with the divorce.").

25. 297 A.2d 424, 427 (Del.Ch.1972).

The facts of the *Wife K* case are similar to those here. In that matter, this court was faced with an action between former spouses for partition of real property and allocation of the proceeds following a divorce action in which no division of marital property was requested or made. There, as here, a petition to reopen the divorce was denied by the Family Court. Yet, unlike the dispute between the Savages, in the *Wife K* case, the plaintiff in the subsequent action in the Court of Chancery argued that he (as a husband) was unaware of his ability to petition the Family Court for a division of property because the statute at that time spoke only of a wife's right to do so. Notwithstanding the husband's alleged ignorance, this court concluded that the husband could have availed himself of the remedy and therefore found a lack of subject matter jurisdiction to hear his complaint.

Angela presents a less compelling story here. She does not claim that she was unaware of her possible remedy within the Family Court. Instead, she claims she forwent that remedy based a combination of sympathy for Larry's condition at the time and her reliance on representations made by Larry regarding her rights in the Home. Neither of these reasons is sufficient to extend the jurisdiction of this court to hear her case. At the time of the divorce, Angela was aware that the deed to the Home she lived in did not list her name, and she knew of, and had made payments on, the mortgage on the Home held solely in Larry's name. Angela's election not to pursue her interests at that time was a knowing choice. Perhaps she felt she would fare better in private bargaining with Larry, or that she might be forced to move out of the Home by the Family Court, or maybe she simply hoped for a fair out-of-court resolution leaving her and Larry feeling good about maturely settling their differences. Her motivations are of no moment, though, nor is Larry's prior conduct.

Why? Because the reason for Angela's failure to seek relief earlier in the Family Court is irrelevant to whether this court has jurisdiction. If there is a cognizable basis in equity and law to excuse Angela's presentation of her claims at this stage—e.g., if she can prove (contrary to some of her own contentions) that she did not seek a property division because Larry promised to give her a half-interest in the Home and later reneged—that basis should be presented to the court with exclusive jurisdiction over claims of the kind Angela presses: the Family Court. Alternatively, Angela should present her claims on a more straightforward basis that acknowledges that she is pressing a new case that involves matters that she and Larry could have, but did not, seek to litigate in the context of their divorce because they were still attempting to reach an out-of-court settlement.[26] In aid of that cause, she can

26. One can reasonably question whether petitioning under Rule 60(b) on grounds of excusable neglect was the correct basis for Angela to invoke the Family Court's jurisdiction given that both she and Larry consciously chose to end their divorce proceedings while leaving the issue of the division of their marital property unaddressed by a judicial order. Perhaps a new complaint invoking § 507 directly may fare better. *See E.F.L.,* 2002 WL 1929538, at *3 (enforcing agreement between former spouses not incorporated in their divorce); *see also* Del. S.B. 106, 135th Leg., 1st Sess., 67 Del. Laws, ch. 89 (1989) (expressing General Assembly's intent that the Family Court's jurisdiction be broadened precisely to address situations when spouses failed to ask the Family Court to address ancillary matters during their divorce dispute). But whether or not the Family Court will hear an action directly under § 507 at this time is immaterial to whether this court has jurisdiction. *See Sanders,* 570 A.2d at 1192 (acknowledging that a plaintiff is not denied a remedy at law even when the Family Court could not hear a

invoke the statutes cited. If the Family Court ultimately refuses to hear her claims in whatever new form they are presented, Angela may appeal to the Supreme Court.[27]

What she cannot do is bypass the statutorily proper court to press claims in the Court of Chancery that are, by law, exclusively the province of the Family Court. The Family Court has been granted the full powers of equity to address the issues that concern Angela—her interest in the Home and how her upkeep of the Home and Larry's alleged non-provision of child support affects that interest. Only the Family Court can address the comprehensive range of issues facing Larry and Angela; indeed, the creation of the Family Court largely flowed from the General Assembly's desire to create a court that could address all of the difficult issues attendant to the break-up of marriages.[28] In that creative process, the General Assembly relieved this court of its jurisdiction over matters like these and it is this court's duty to respect that legislative decision.

For all these reasons, Larry's motion to dismiss for lack of subject matter jurisdiction is granted. Without commenting on whether the Family Court will hear her claims, I will note that the dismissal is without prejudice and Angela is free to exercise her transfer rights under 10 *Del. C.* § 1902. The timeliness and sufficiency of her claims can then be addressed by the Family Court. IT IS SO ORDERED.

---

direct action seeking related relief if an opportunity to seek to reopen the divorce proceeding existed).

27. The reality that Angela already pursued the Rule 60(b) route is not lost on me. What effect that would have on her filing of a new action is a matter for the Family Court to consider initially, not this court, with the only avenue of review of the Family Court properly resting in our Supreme Court, not this court.

28. *See Wife, P. v. Husband, P.*, 287 A.2d 409, 412–413 (Del.Ch.1972) (describing and applying statutory purpose).