**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SELENA E. MOLINA
MASTER IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: May 31, 2023
Date Submitted: February 2, 2023

Jason C. Powell, Esquire
Thomas J. Reichert, Esquire
The Powell Firm, LLC
1813 North Franklin Street
Wilmington, DE 19802

Aaron E. Moore, Esquire
Marshall Dennehey Warner
Coleman & Goggin
1007 North Orange Street, Suite 600
Wilmington, DE 19899

Joseph H. Huston, Jr., Esquire
Stevens & Lee, P.C.
919 North Market Street, Suite 1300
Wilmington, DE 19801

Re: *Dan Nestor v. Karen Poore, Ellen Donahue, and Creative Planning, LLC*, C.A. No. 2022-0066-SEM

Dear Counsel:

In this action, the plaintiff seeks judgment against his ex-wife, her business partner, and their employers for alleged misdeeds. Although couched as a fiduciary-duty case, this action is largely an extension of prior Family Court proceedings. Thus, I find the plaintiff's claims against his ex-wife are within the Family Court's exclusive jurisdiction and should be dismissed with leave to transfer. The remaining claims may well fall within an arbitration agreement. But I cannot make a final recommendation because (1) there is a factual dispute regarding whether the plaintiff signed the agreement and (2) the agreement is governed by Massachusetts law,

which neither side has briefed. Thus, I am staying exceptions to this ruling and

ordering further proceedings as explained herein.

## I. BACKGROUND[1]

The plaintiff, Dan Nestor ("Nestor") and defendant, Karen Poore ("Poore")

were once married but separated on January 2, 2018 and divorced on March 4, 2019.[2]

Prior to their divorce, Poore and Ellen Donahue ("Donahue")—Poore's business

partner—worked as Nestor's financial planners through an investment company

called Creative Financial Group ("CFG," with Poore and Donahue, the "CFG

Defendants").[3] Poore and Donahue are also certified financial planners with Mass

Mutual Investor Services, LLC ("MMLIS," with the CFG Defendants, the

---

[1] Unless otherwise noted, all factual averments are taken from the second amended complaint and the exhibits attached thereto. Docket Item ("D.I.") 22. Factual assertions in the complaint are accepted as true if well-pleaded. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The CFG Defendants also ask me to consider documents outside the operative pleadings: Exhibit A (the redline reflecting the latest amendments to the complaint), Exhibit C (protection from abuse records from the Family Court), Exhibit D (a pretrial stipulation from the Family Court), Exhibit E (e-trade email notifications), Exhibit F (defined herein as the Divorce Agreement), Exhibit G (Nestor's motion to reopen the Family Court proceedings), Exhibit H (the Family Court's denial of Exhibit G), Exhibit I (a letter from Nestor's counsel to Poore), Exhibit J (emails between Nestor and Poore), Exhibits K-L and O (texts between Nestor and Poore), and Exhibits M-N (texts from Nestor to Donahue). D.I. 29. Exhibits B, P, and Q are the Complaint, as defined herein, and attachments to it. *Compare* D.I. 29, *with* D.I. 22, Exhibit ("Ex.") A. I address whether the extrinsic documents are appropriate for consideration within my analysis.

[2] D.I. 22 ¶7.

[3] *Id.* at ¶¶7-8, 10.

"Defendants").[4]   MMLIS is a FINRA regulated brokerage firm through which

CFG's investment and securities services are offered.[5]

### A.     The Divorce

Nestor and Poore's marriage frayed in or about 2018 and the couple divorced

in 2019.[6]   Following their divorce, Nestor and Poore entered into a divorce

settlement agreement (the "Divorce Agreement").[7]   The Divorce Agreement was

executed and became effective on May 13, 2020; it was then incorporated into the

final decree from the Family Court.[8]   The purpose of the Divorce Agreement was to

"serve as a final and complete settlement of all property rights and obligations

between [Nestor and Poore]."[9]   To accomplish that end, the Divorce Agreement

identified all separate and marital property and directed its disposition after the

divorce.[10]   For the separate property of either side, the Divorce Agreement provided

that that other party "disclaims and waives any and all rights and interests in [those]

---

[4] *Id.* at ¶5.

[5] *Id.* at p.6, n.2.

[6] *Id.* at ¶7.

[7] D.I. 29, Ex. F.

[8] *Id.*

[9] *Id.*

[10] *Id.*

assets."[11]  Nestor, specifically, retained an e-trade account, a Brighthouse annuity account, and a WSFS account, in addition to certain real and personal property and business interests.[12]

### B.    Pre-Divorce

"For many years" before the divorce, beginning in 1998, Nestor gave Poore and Donahue access to his "bank accounts, stock brokerage accounts and other accounts with sensitive information[.]"[13]  Nestor avers he trusted Poore and Donahue as his financial advisors but revoked their authority "[s]ubsequent to" the divorce.[14]

Under the prior arrangement, Nestor, with the assistance of Poore, opened an IRA account with New England Securities Corporation ("NES").[15]  The account registration was purportedly signed by Nestor, as the account holder, and by Poore as his registered representative on April 16, 2007.[16]  Nestor disputes that he signed the registration agreement.[17]  Directly above Nestor's purported signature is an

---

[11] *Id.*

[12] *Id.*

[13] D.I. 22, ¶¶8-9.

[14] *Id.* at ¶11.

[15] D.I. 22, Ex. A.

[16] *Id.*

[17] D.I. 22, ¶62.

acknowledgement: "[I] acknowledge and agree to the Pre-dispute Arbitration Agreement (located on the back of this application) and I have also received[,] read[,] and understand the NES Disclosure Statement given to me by my registered representative along with this application."[18]

The attached arbitration agreement (the "Arbitration Agreement") provides, in pertinent part:

> Client agrees that any controversy concerning an Account whether arising before or after the date this Account is opened and arising out of or relating to this Agreement or any transactions between Client and [NES] or Pershing LLC their employees[,] directors[,] agents[,] officers or affiliates shall be determined by arbitration before the NASD Dispute Resolution Inc.[19]

The Arbitration Agreement further provides: "Client acknowledges and agrees this Section titled 'Pre Dispute Arbitration Clause' shall survive termination of this Agreement."[20]  As for the governing law, the Arbitration Agreement "and its enforcement shall be governed by the laws of the state of Massachusetts."[21]

---

[18] D.I. 22, Ex. A, at 4.

[19] *Id.* at 7.

[20] *Id.*

[21] *Id.*

### C.     Post-Divorce

Nestor avers that he revoked any authority relating to his finances after the divorce. Nevertheless, Nestor avers Poore and Donahue, in their professional capacity, continued to access Nestor's accounts resulting in (1) losses on his e-trade account from day trading, (2) mortgage payments for Poore's house, (3) cancelled insurance for Nestor's house, (4) payments toward Poore's personal loan, (5) other unauthorized access and misappropriation, and (6) a forged signature.[22] Nestor does not specify in the pleadings which accounts were improperly accessed and utilized, nor does he quantify his damages.

Nestor further alleges that in or around October of 2019, while he resided at a property owned by Donahue, Donahue took secret recordings of him with hidden cameras without his knowledge.[23] When Nestor confronted Poore and Donahue about their alleged conduct with his financial accounts, they threatened to release those sensitive images.[24]

---

[22] D.I. 22, ¶12.

[23] *Id.* at ¶14.

[24] *Id.* at ¶¶15-16. Nestor alleges that Poore and Donahue sent him a Google Drive link containing the sensitive materials but that the link was eventually taken down. *Id.*

### D.    Procedural Posture

Nestor filed his original complaint on January 1, 2022, against Poore, Donahue, and Creative Planning, LLC.[25]   On February 8, 2022, Nestor filed an amended complaint removing Creative Planning, LLC and replacing it with CFG, Creative Financial Group, Ltd., Creative Financial Concepts, Inc., and MMLIS.[26] After the named defendants moved to dismiss or compel arbitration, Nestor amended the complaint again on August 5, 2022 (the "Complaint").[27]

In the Complaint, Nestor removed Creative Financial Group, Ltd. and Creative Financial Concepts, Inc. as defendants, leaving the Defendants.[28]  Against the Defendants, Nestor states eight (8) counts: (1) breach of fiduciary duty, (2) unjust enrichment, (3) permanent injunction (financial account access), (4) permanent injunction (blackmail), (5) imposition of a constructive trust, (6) professional negligence, (7) invasion of privacy, and (8) declaratory judgment (no agreement to arbitrate).[29]

---

[25] D.I. 1.

[26] D.I. 4.

[27] D.I. 22.

[28] *Id.*

[29] *Id.*

On August 19, 2022, the CFG Defendants again moved to dismiss the Complaint (the "CFG Motion").[30]  MMLIS also renewed their motion to compel arbitration or, in the alternative, to dismiss (the "MMLIS Motion," with the CFG Motion, the "Motions").[31]  The Motions were fully briefed on October 17, 2022.[32]  Thereafter, the assigned judicial officer, Master Griffin, retired and this action was reassigned to me.[33]  I heard oral argument on the Motions on February 2, 2023, and took the Motions under advisement.[34]

## II.  ANALYSIS

The Defendants seek dismissal for lack of subject matter jurisdiction under Court of Chancery Rule 12(b)(1).  Under Rule 12(b)(1), a motion to dismiss for lack of subject matter jurisdiction will be granted where "it appears from the record that the Court does not have subject matter jurisdiction over the claim."[35]

The Court of Chancery acquires jurisdiction in three ways, "namely, if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the

---

[30] D.I. 23.

[31] D.I. 25.

[32] D.I. 36-37.

[33] D.I. 40.

[34] D.I. 45.

[35] *AFSCME Locals 1102 & 320 v. City of Wilm.*, 858 A.2d 962, 965 (Del. Ch. 2004).

plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[36] "The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."[37]

In determining whether it has subject matter jurisdiction, this Court is not always limited to the pleadings. "In reviewing a motion to dismiss under Rule 12(b)(1), the Court may consider documents outside the complaint, although when a challenge to subject matter jurisdiction is directed to the face of a complaint, the court accepts the plaintiff's allegations of fact."[38] Here, I find it appropriate to consider some, but not all, of the documents attached to the CFG Motion. As reflected below, I have considered the Divorce Agreement, Nestor's motion to reopen the Family Court proceedings, and the Family Court's denial of that motion.[39]

A challenge to subject matter jurisdiction is a gating exercise; if it succeeds, this Court should not address the underlying merits of the claims not properly before it. Thus, I first address the Family Court overlay; then I turn to arbitration. Until a

---

[36] *Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (citations omitted).

[37] 10 *Del. C.* § 342.

[38] *Paul Capital Advisors, L.L.C. v. Stahl*, 2022 WL 3418769, at *9 (Del. Ch. Aug. 17, 2022), as corrected (Aug. 25, 2022) (cleaned up).

[39] D.I. 29, Ex. F-H.

final ruling regarding arbitration, I decline to address the arguments for dismissal for failure to state a claim under Court of Chancery Rule 12(b)(6).

### A. The Family Court has subject matter jurisdiction over the claims arising out of the Divorce Agreement.

Poore argues that the claims against her arise from, or are incident to, the Divorce Agreement and, as such, are within the Family Court's exclusive jurisdiction. I agree.

Under 13 *Del. C.* § 507:

[t]he Family Court of the State… ha[s] exclusive jurisdiction over the construction, reformation, enforcement and rescission of agreements made between future spouses, spouses and former spouses concerning the payment of support or alimony, the payment of child support or medical support, the division and distribution of marital property and marital debts and any other matters incident to a marriage, separation or divorce. The Court shall have jurisdiction to resolve any issues resulting from the construction, reformation, enforcement or rescission of an agreement.[40]

This statute has been interpreted broadly by this Court, appreciating that "the creation of the Family Court largely flowed from the General Assembly's desire to create a court that could address all of the difficult issues attendant to the break-up of marriages."[41]

---

[40] 13 *Del. C.* § 507.

[41] *Savage v. Savage*, 920 A.2d 403, 413 (Del. Ch. 2006).

The breadth of Section 507 was addressed by this Court in *Savage v. Savage*.[42]

In *Savage*, divorced spouses were disputing ownership of the home they lived in

while they were married.[43]  The former wife filed a complaint in this Court seeking

to add her name to the home's title or for a trust to protect her interests therein.[44]

But the parties already had the opportunity to address such claims with the Family

Court and failed to do so.  "Instead of hammering out a division of marital property

in the Family Court, [the parties] opted to let their divorce case close without asking

the Family Court to involve itself in the question of what property each would take

from the marriage.  Therefore, … the Family Court closed the [parties'] divorce

case."[45]  When the former wife came back to reopen, the Family Court refused,

finding she had no legal right to remain in the home.[46]

Despite the Family Court's refusal and the former wife's argument that she

lacked a remedy at law, then-Vice Chancellor Strine found the property dispute

outside this Court's jurisdiction.  At its core, the dispute was about an agreement

within the scope of Section 507 and the Court held: "the General Assembly explicitly

---

[42] *Id.*

[43] *Id.* at 404.

[44] *Id.*

[45] *Id.* at 406.

[46] *Id.* at 407.

amended Section 507 to entrust the Family Court with jurisdiction over these agreements and to end this court's involvement in such matters."[47] That the former wife failed to avail herself of the Family Court remedy in a timely manner was not sufficient to invoke this Court's jurisdiction.

The same is true here. Nestor and Poore executed, and the Family Court adopted, the Divorce Agreement, which provides for the division of their assets. It was expressly meant to "serve as a final and complete settlement of all property rights and obligations between the parties."[48] It further provides that the parties waive "any and all rights and interests" in the assets retained by their former spouse. Nestor avers, in this action, that Poore has continued to access and utilize the property retained by Nestor "[s]ubsequent to" the divorce.[49] These claims directly implicate the Family Court's exclusive jurisdiction to enforce the division of those assets. Nestor cannot avoid Family Court's jurisdiction, nor invoke this Court's jurisdiction, with the incantation of "fiduciary duties."[50] Such is particularly

---

[47] *Id.* at 410.

[48] D.I. 27, Ex. F.

[49] D.I. 22, ¶¶ 9, 11.

[50] *See Candlewood Timber Gp., LLC*, 859 A.2d at 997 (explaining that the court "must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain") (citing *Diebold Comput. Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586 (Del. 1970)).

unpersuasive because Nestor avers that he revoked any fiduciary authority in connection with the divorce. Further, like in *Savage*, the Family Court's denial of Nestor's motion to reopen is immaterial. Finally, the remaining claims against Poore, related to invasion of privacy and blackmail, fall with the Family Court's broad jurisdiction to hear as incident to the divorce and the ongoing strife in the former spouses' relationship.

For these reasons, I find all claims against Poore should be dismissed with leave to transfer to the Family Court under 10 *Del. C.* § 1902.[51]

### B. Further proceedings are needed to determine if the remaining claims should be compelled to arbitration.

This leaves the claims against Donahue, CFG, and MMLIS. These defendants argue that any claims against them are subject to the Arbitration Agreement. But there remains a dispute of fact regarding whether Nestor signed that agreement. Further, the Arbitration Agreement is governed by Massachusetts law, which has not been briefed. These issues merit further consideration.

When there is a factual (rather than facial) challenge to subject matter jurisdiction and the extrinsic documents create a dispute of fact with the averments in the pleadings, the plaintiff—here, Nestor—must "support [his] allegations with

---

[51] *Banks v. Coffin*, 2022 WL 2200369 at *5 (Del. Ch. June 21, 2022).

competent proof."[52]  The Court then weighs that proof to "satisfy itself as to the existence of its power to hear the case. . . . The burden is upon the plaintiff (or counterclaim plaintiff) to prove that jurisdiction does in fact exist."[53]

Judge Rennie of the Superior Court recently addressed this burden in a factually similar case *Hurtt v. Del Frisco's Restaurant Group*.[54]  There, the plaintiff sued her employer for alleged discrimination; the employer then moved to dismiss for lack of subject matter jurisdiction, pointing to an arbitration agreement.[55]  The plaintiff responded that she was not aware of the agreement, did not sign it, and, thus, should not be bound to it.[56]  To resolve this material dispute of fact, Judge Rennie held an evidentiary hearing and held the plaintiff to her burden of proving she did not sign, and thus was not bound to, the agreement.[57]

I adopt the same procedure here.  An evidentiary hearing will be held where Nestor will bear the burden of proving he did not sign the Arbitration Agreement.

---

[52] *Yancey v. National Tr. Co., Ltd.*, 1993 WL 155492, at *6 (Del. Ch. May 7, 1993), *aff'd*, 633 A.2d 372 (Del. 1993).

[53] *Rembrandt Techs., L.P. v. Harris Corp.*, 2008 WL 4824066, at *4 (Del. Super. Oct. 31, 2008), vacated on other grounds, 2009 WL 2490873 (Del. Super. Aug. 14, 2009) (cleaned up).

[54] 2019 WL 2516763, at *1 (Del. Super. June 18, 2019).

[55] *Id.* at *1.

[56] *Id.* at *3.

[57] *Id.* at *2. She failed to meet that burden. *Id.* at *6.

To help me address that burden, the parties need to resolve the potential choice-of-laws issue. After the hearing, I will invite post-hearing briefing on what standard I must apply to determining if, on the evidence adduced, Nestor should be bound to the Arbitration Agreement and to what extent. If I find any of the remaining claims are within this Court's subject matter jurisdiction, I will also address the arguments made under Court of Chancery Rule 12(b)(6), without further briefing.

## III. CONCLUSION

For the above reasons, I find this Court lacks subject matter jurisdiction over the claims against Poore. Those claims should be dismissed, with leave to transfer to the Family Court. Further proceedings are needed to address subject matter jurisdiction over the remaining claims. The parties should meet and confer and contact my chambers to schedule these proceedings. Until I issue a final report on the remaining claims, exceptions under Court of Chancery Rule 144 are stayed.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery